U.S. v. Billmyer, Josleyn                CR-94-29-JD    07/17/97

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

        v.                          Criminal No. 94-29-01, 04-JD

John W. Billmyer
Dennis R. Josleyn


                        O R D E R


    On the basis of evidence which in the opinion of the court

was overwhelming, accord United States v. Joselyn, 99 F.3d 1182,

1189 (1st Cir. 1996), cert. denied, 117 S. Ct. 959 (1997),

defendants John Billmyer and Dennis Joselyn were convicted of

conspiring to commit mail fraud against their former employer,

American Honda Motor Company ("American Honda"), by accepting

money and other consideration from Honda dealers in exchange for

dealership rights and favorable vehicle allocations.  Joselyn was

also convicted of engaging in a pattern of racketeering activity

in violation of RICO, 18 U.S.C. § 1962(c), and of conspiring to

commit and committing mail fraud by accepting kickbacks in

relation to Honda sales training seminars.  Following an

unsuccessful appeal of their convictions, Billmyer and Joselyn

have filed motions for a new trial pursuant to Fed. R. Crim. P.

33 on the basis of newly discovered evidence (document nos. 521 &

535).  The defendants again fail to prevail.

<u>Background</u>[1]

I.   <u>The Trial</u>

Among the defenses raised at trial by Billmyer and Joselyn, who served as American Honda's national sales manager and west coast zone manager, respectively, was their assertion that the receipt of money and other consideration from Honda dealers or sales training vendors could not form the basis of any criminal liability because Japanese management at American Honda -- the entity that the government claimed was the victim of the defendants' conduct -- condoned their behavior.  In order to support this contention, the defendants, primarily through counsel for defendant Joselyn, elicited testimony from various witnesses, including Cecil Proulx and J.D. Power, who were called as defense witnesses.

Proulx, who was hired in 1985 as Honda's corporate procurement manager, testified that he had spoken with several Honda employees who believed that Japanese management at the company knew of and condoned the practice of American employees accepting bribes in exchange for the granting of Honda dealerships, but declined to do anything about it.  Proulx also

<hr />

[1]As a thorough presentation of the facts is set forth in the First Circuit's opinion in <u>Joselyn</u>, 99 F.3d at 1185-87, the court recites only those facts that are necessary to an understanding of the issues raised by the instant motions.

testified that American Honda's vice president of administration told him that the company condoned its employees' receipt of kickbacks because it could not afford to pay its employees the same amount as competing automobile makers. In addition, Proulx testified that in 1987, he sent a letter to Bud Smoot, an attorney who represented American Honda and who served on its board of directors, expressing his concern over American Honda's failure to respond to "credible information (external and internal) . . . concerning vendor gifts, far in excess of $25 in value, to highly-placed individuals."

Power, an automobile industry analyst, testified that in 1983 he informed Yoshihide Munekuni, who at the time was American Honda's executive vice president, that the practice of inviting dealers to pay American Honda executives both for the granting of new dealerships and the favorable allocations of vehicles had become rampant. Power further testified that he later met with Munekuni to discuss the matter[2] and that, in response to Power's allegations, Smoot asked Power whether he could provide the names of any dealers who would be willing to confirm his assertions. Power testified that he told Smoot that he was unable to provide the name of any dealer who was willing to come forward, and

---

[2]The defense was not informed of the meeting between Power and Munekuni until after the close of the government's case.

stated that he discerned no change at American Honda following his communications with Munekuni and Smoot.

The testimony of Proulx and Power was at odds with that of Stanley James Cardiges, who succeeded Billmyer as Honda's national sales manager. Cardiges testified that he had received large sums of money from prospective dealers but asserted that he had no firsthand knowledge that American Honda's Japanese management condoned this behavior.

Other evidence introduced at trial relevant to the issue of Japanese condonation indicated that American Honda's conflict of interest policy expressly prohibited employees from accepting anything of significant value from Honda dealers or holding an ownership interest in a Honda dealership. In addition, the government elicited detailed testimony describing the discreet fashion in which dealers made payments to the defendants.

The government asserted during closing arguments that the defendants' condonation defense was "[a]bsolutely made up of whole cloth." During rebuttal, the government attempted to downplay the testimony of Proulx, describing him as someone who "sees evil things everywhere" and noting that he never was able to provide evidence of condonation by Japanese management of

4

dealer payments to American Honda executives.[3]  The government

further contended that the company, rather than condoning the

practice of accepting kickbacks from prospective dealers,

attempted to investigate Power's assertions but was hindered by a

lack of cooperation from dealers.

The issue of condonation by Japanese management was

thoroughly litigated during the course of the trial and the court

gave the following instruction with respect to the defendants'

theory of the case:

> It is [the defendants'[4]] theory of the case that
> American Honda knew of and condoned (that is, gave
> tacit approval to) the activities of its employees
> alleged in the indictment that were in violation of its
> policies.  American Honda's knowledge or condonation of
> the commission of an offense does not by itself
> constitute a defense or excuse.  However, any evidence
> of American Honda's actions or omissions, or evidence
> of deficiencies in the manner in which it implemented
> and enforced its policies and procedures, may be
> considered by you to the extent that such evidence
> bears on the issue of whether or not [the defendants]
> formed the required intent to commit the crimes with
> which [they are] charged. [The defendants] contend[]
> that because [they] believed American Honda knew of and

---

[3]Defendant Billmyer asserts that the government's response to
the condonation defense was to "cr[y] 'rumor' at allegations of
involvement and knowledge by the Japanese who controlled American
Honda." Billmyer Motion for New Trial ("Billmyer Motion") at 14.
The government denies making such an assertion and contends that
the cornerstone of its position during trial and closing argument
was that the defendants knew that their conduct was wrong and
took great effort to conceal their actions.

[4]See Trial Tr., 5/19/95, at 41-42, 63.

5

condoned the activities in question, [they] did not possess the required intent to commit the offenses with which [they are] charged.

On the seventh day of deliberation, the jury returned guilty verdicts against the defendants on all counts.

II.  The New Evidence

The defendants claim there are four items of new evidence that bolster their condonation defense and warrant a new trial.

A.  Roger Novelly

Roger Novelly worked for American Honda from February 1981 through March 1993, working his way up from district manager to zone manager.  In 1994, Novelly pled guilty to conspiring to defraud American Honda by receiving cash payments from dealers and possessing a hidden ownership interest in a Honda dealership in Brighton, Michigan.

On October 16, 1996, during a deposition taken during the course of related civil litigation, Novelly testified that in approximately June 1992, he was informed by his regional manager that Koiechi Amemiya, who served as president of American Honda during the 1980s and early 1990s, wanted Novelly to provide a favor for Amemiya by obtaining, free of charge from a Honda dealership in Steubenville, Ohio, an automobile for the use of

6

one of Amemiya's friends.  Novelly further testified that

> it was obvious to me that [Amemiya] was calling --
> singling out this one dealer because of what he knew
> about my involvement in Brighton Honda because Jerry
> Kopac was the dealer principal in Steubenville . . .
> but also was the man who strawed the dealership for me
> in Brighton.

Novelly's testimony also indicates that he informed the FBI of the "Amemiya episode" prior to the defendants' trial.  The defendants have represented that they were not provided with this information.

Billmyer and Joselyn argue that there is a reasonable probability that the result of their trial would have been different if the defendants had been able to use this information at trial.  Specifically, they assert that Novelly's testimony

> provides concrete, direct evidence of Amemiya -- a
> president of Honda during the alleged existence of the
> Count II conspiracy -- (1) knowing of a zone manager
> having a hidden ownership interest in a Honda
> dealership and (2) receiving a gratuity from a dealer
> in violation of written Honda policy, the same written
> policy used by the Government as the basis for its
> fraud theory.

Billmyer Motion at 11.  The defendants further contend that the government's assertion during closing argument that the defendants' condonation defense was baseless mandates a new trial on due process grounds, because it was made with knowledge of what Novelly had told the FBI but without disclosure to the defendants of the information that Novelly provided.  Billmyer

7

Motion at 17 (citing United States v. Udechukwu, 11 F.3d 1101 (1st Cir. 1993).

B. John Conway

John Conway worked for American Honda from October 1977 through 1986, eventually advancing to the position of regional sales manager. He testified at trial about payments he received from dealers. During discovery related to the civil litigation, Conway testified that he informed Billmyer of J.D. Power's 1983 meeting with Munekuni, and that Munekuni did nothing in response to the allegations that Power had brought to his attention. Conway also asserted that he disclosed this information to the government prior to the defendants' trial, but that Assistant United States Attorney Connolly stated that he was not interested in this information because the government had decided to portray Honda as the victim of the defendants' conduct.[5] As noted above, it was not until after the close of the government's case that the government disclosed to the defendants the substance of Conway's testimony, i.e., that Power contacted Munekuni in 1983 to discuss the practice of American Honda employees receiving kickbacks from dealers and that Munekuni failed to take

_____

[5]The government denies that Attorney Connolly made such a statement.

8

corrective correction in response. In addition, the government never revealed to the defendants the alleged assertion by Connolly concerning the government's decision to portray Honda as a victim.

The defendants claim that prompt disclosure of Conway's testimony would have permitted them to use this information during their cross-examination of Conway and Cardiges, among others, and "would have provided powerful evidence of Japanese knowledge in the middle of the Government's case." Billmyer Motion at 22. In addition, they contend that the government's failure to disclose Attorney Connolly's statement itself constitutes a Brady violation because the statements he made during the interview with Conway "go[] directly towards the Government's motives for prosecution." Id. at 23.

### C. The Honda Conviction

The third item of newly discovered evidence on which the defendants rely is American Honda's 1966 plea of nolo contendere to charges of conspiracy to violate the Sherman Act, 15 U.S.C. § 1. The defendants argue that the conviction, which was not disclosed to the defendants prior to trial and relates to a conspiracy among American Honda, its dealers, and its dealer associations to fix prices for Honda motorcycles, see generally

9

<u>United States v. American Honda Motor Co.</u>, 273 F. Supp. 810 (N.D. Ill. 1967), would have undercut the government's attempt to portray American Honda as a victim of the defendants' conduct and as a model corporate citizen.

    D.  <u>Stanley James Cardiges</u>

The final item of evidence the defendants rely on is the recent deposition testimony provided by Stanley James Cardiges, which, the defendants contend, not only is inconsistent with the testimony he offered at trial, but also shows that Cardiges committed perjury during the trial.  A substantial portion of the information Cardiges provided is summarized in a letter written to the court by Cardiges' counsel in reference to a motion filed by the government pursuant to Fed. R. Crim. P. 35, and mirrors Cardiges' deposition testimony.[6]  Cardiges' counsel writes:

> In [1987][7] Mr. Cardiges received a letter from a "dirty dealer" offering to give him a BMW.  Mr. Cardiges

---

[6]In the letter, Cardiges' counsel represents that "[t]he emerging facts as to the nature and degree of knowledge, approval, participation in, and encouragement of the Honda Commercial Bribery Activities by and on the part of the most senior Japanese officials of Honda has come about largely through the efforts of Jim Cardiges."

[7]Although Cardiges' counsel claims that the offer was made in 1982 or 1983, the letter in which the offer was made is dated March 25, 1987.  Appendix to Government's Objection to Billmyer Motion, Ex. 4.

showed the letter to Jack Billmyer, who in Cardiges'
presence took the letter into the office of American
Honda's then top Japanese executive(s) (Munekuni and/or
Chino) and showed the letter to them.  Cardiges did not
accept the BMW.  The dealer was subsequently awarded a
second Honda franchise in Hawaii, and an Acura
franchise.[8]  No corrective action was taken.

Appendix to Billmyer Motion, Ex. 2. at 4.  The defendants also
cite the following passage from Cardiges' deposition testimony:

[A]s I told the FBI and other U.S. attorneys and many
other attorneys, I always felt or suspected that people
above me knew of different activities that were going
on. . . . It was my feeling, my opinion.  I was there.
I felt that and I saw it.[9]

Id. Ex. 9, at 98-99.  Finally, the defendants note that Cardiges

stated during his deposition testimony that he "had heard" of

---

[8]Evidence submitted by the government undermines Cardiges'
counsel's assertion that the dealer was awarded Honda and Acura
dealerships after making an offer to Cardiges.  The government's
evidence indicates that the dealer who offered Cardiges a BMW was
awarded a Honda dealership in Hawaii in 1979 and an Acura
dealership in 1985, prior to making the offer in question to
Cardiges.  See Appendix to Government's Objection to Billmyer's
Motion, Exs. 6-7.

[9]Notably, the following part of this testimony was omitted by
counsel:

I had nothing -- I had no proof, and that's what the
FBI kept hammering, "Do you have some written proof?
Do you have pictures?"  Do you have this, do you have
that, and I did not have any hard substantial proof.

When examined as a whole, this statement is consistent with the
position Cardiges took at trial.  The court expects to be
provided with all relevant portions of testimony that counsel
considers appropriate for quotation without omissions that alter
the meaning of the testimony being discussed.

instances in which Japanese management received gratuities, including a "Mercedes-type automobile," an expensive painting, and a Rolex watch, from dealers.

Discussion

A defendant seeking a new trial based upon newly discovered evidence must establish that

> (1) the evidence was unknown or unavailable to defendant at the time of trial;
>
> (2) the failure to discover the evidence was not due to a lack of diligence on the part of defendant;
>
> (3) the new evidence is material; and
>
> (4) the evidence would probably produce an acquittal upon retrial of defendant.

See United State v. Tibolt, 72 F.3d 965, 971-72 (1st Cir. 1995), cert. denied, 116 S. Ct. 2254 (1996); United States v. Ortiz, 23 F.3d 21, 27 (1st Cir. 1994); Fed. R. Crim. P. 33. If the new evidence was within the government's control and its disclosure was withheld, the standard is more relaxed. In such a case, a defendant satisfies his burden under both the third and fourth criteria merely by showing that there is a reasonable probability, i.e., "a probability sufficient to undermine confidence in the outcome" of the trial, that introduction of the newly discovered evidence would have yielded a not guilty

verdict. See Tibolt, 72 F.3d at 971; see also Kyles v. Whitley, 514 U.S. 419, 434 (1995); United States v. Bagley, 473 U.S. 667, 682 (1985). Finally, the effect of each item of newly discovered evidence must be viewed not only individually, but in conjunction with all other newly discovered information. See Kyles, 514 U.S. at 436.[10]

A. Roger Novelly

As noted above, the defendants contend that Novelly's testimony concerning the Amemiya episode, which was not disclosed to them prior to trial, provides concrete evidence that a member of American Honda's Japanese management knew that a zone manager had a hidden ownership interest in a Honda dealership and received a gratuity from a dealer in violation of written Honda policy. However, Novelly, who himself plead guilty to defrauding American Honda, admitted during the deposition testimony that Amemiya never expressly indicated to him that he knew of

---

[10]With respect to Cardiges' testimony, the defendants have urged the court to apply the so-called Larrison standard, which the First Circuit has suggested may be applicable to new evidence indicating that a witness gave deliberately false testimony. See United States v. Wright, 625 F.2d 1017, 1020 (1st Cir. 1980); Larrison v. United States, 24 F.2d 82, 87 (7th Cir. 1928). Because the new evidence proffered by the defendants is insufficient to establish that Cardiges gave deliberately false testimony at trial, see infra, the court need not analyze Cardiges' testimony under this standard.

Novelly's ownership interest in the Brighton Honda dealership. See Appendix to Government's Objection to Billmyer Motion, Ex. 15 at 527-31. Thus, the evidence is in large part duplicative of the testimony suggesting Japanese condonation of the defendants' conduct.[11] Moreover, the Novelly testimony is of limited relevance with respect to the issue of the defendants' intent. Indeed, even assuming that Amemiya had knowledge of Novelly's activities, the defendants have provided no new evidence indicating that they themselves were aware of Amemiya's knowledge of Novelly's conduct.[12] Thus, the evidence has little bearing on the defendants' good-faith belief that American Honda condoned

---

[11]That Novelly's testimony is consistent with and, in fact, duplicative of, the evidence offered at trial distinguishes this case from United States v. Udechukwu, 11 F.3d 1106 (1st Cir. 1993). In Udechukwu, the court found prosecutorial misconduct where during closing argument the government repeatedly questioned the existence of the defendant's supplier, by whom the defendant claimed she had been coerced to smuggle drugs into the United States, despite the fact that the government had information, which it never disclosed to the defendant, indicating that the source named by the defendant was in fact a drug trafficker. See id. at 1106. In the instant case, the Novelly testimony is at best speculative as to the issues of Japanese condonation and, ultimately, the defendants' intent to defraud American Honda, and does not directly contradict the evidence adduced at trial or the position that the government took during closing argument. Thus, the court need only evaluate the Novelly testimony under the traditional Rule 33 framework for newly discovered nondisclosed evidence.

[12]Notably, Billmyer had left American Honda prior to the Amemiya episode.

14

their behavior.  After weighing the foregoing considerations along with the substantial evidence that the defendants not only knew that their conduct violated company policy but also attempted to conceal their activities, the court finds that the defendants have failed to sustain their burden of demonstrating that there is a reasonable probability that the introduction of the Novelly testimony would have yielded not guilty verdicts. Indeed, the court finds that it is highly improbable that the verdicts would have been different.

B.  John Conway

The defendant's next Rule 33 contention relates to nondisclosure of Attorney Connolly's statement concerning the government's decision to portray Honda as a victim.[13]  However,

---

[13]To the extent the defendants claim that the delayed disclosure of Conway's description of the Power-Munekuni meeting prejudiced their ability to put on a defense, their argument is unavailing.  The defendants were not forced to change their trial strategy as a result of the delay, and the defense was able to use the material effectively in order to suggest that Japanese management was aware of and did not respond to the type of conduct in which the defendants engaged.  See United States v. Devin, 918 F.2d 280, 289 (1st Cir. 1990); cf. Joselyn, 99 F.3d at 1196 (noting that defendant Joselyn "consistently pursued" the Japanese condonation defense despite the delayed disclosure of letters written to the government by Cecil Proulx).  Finally, it is not without significance, particularly as to Billmyer's claims of prejudice resulting from the delayed disclosure, that it was Billmyer himself who informed Conway about the Power-Munekuni meeting.

15

even assuming that Connolly made this statement upon hearing Conway's description of the Power-Munekuni meeting and that this statement constitutes <u>Brady</u> material, it is insufficient to warrant a new trial. The jury, after hearing lengthy trial testimony and after counsel for defendant Joselyn repeatedly questioned whether American Honda could properly be classified as a victim of the defendants' conduct, had ample opportunity to weigh the prosecution's decision to portray American Honda as a victim in the context of assessing whether the defendants formed the intent to defraud their employer. In light of substantial evidence demonstrating the defendants' own recognition that their conduct was wrong, including their awareness of Honda's conflict of interest policy and the great lengths to which they went to conceal their conduct, the court finds that the defendants have failed to sustain their burden of demonstrating that there is a reasonable probability that the introduction of Connolly's statement would have yielded not guilty verdicts. Again the court finds that it is highly improbable that the verdicts would have been different.

C. <u>The Honda Conviction</u>

The court need not devote much attention to the defendants' contention that evidence of American Honda's 1966 plea of nolo

16

contendere to a price-fixing charge would raise a reasonable probability of a different verdict in the defendants' case. Because a corrupt entity can still be defrauded, the evidence has no bearing on the question of whether the defendants formed the requisite intent to commit the crimes with which they were charged.  To the extent that the evidence might have been admissible to rebut the government's evidence indicating that American Honda was a good corporate citizen or to illustrate that American Honda condoned illicit business practices, the evidence is too far attenuated from the issue of the defendants' guilt to raise any reasonable probability that introduction of the evidence would have yielded not guilty verdicts.  The defendants have failed to sustain their burden on this issue and in the opinion of the court it is highly improbable that the introduction of such evidence would have resulted in different verdicts.

D.  Stanley James Cardiges

The final item of new evidence relied on by the defendants is the deposition testimony of Stanley James Cardiges.  Although the defendants contend that this evidence demonstrates that Cardiges deliberately committed perjury at trial when he testified that he had "no proof" of knowledge on the part of

17

Japanese management of bribes and kickbacks, even a quick examination of the evidence reveals otherwise.

First, Cardiges' testimony that he received, and, in the presence of Billmyer and either Chino or Munekuni, declined an offer of a BMW from a prospective dealer, is not inconsistent with his testimony at trial in which he indicated that he had "no specific knowledge of Japanese management at American Honda being involved in or having knowledge of the corruption that existed at the company." Plainly, Cardiges' decision to decline the offer and abide by American Honda's company policy does not exhibit Japanese knowledge or condonation of corruption at the company. Rather, it indicates Japanese knowledge that a dealer made an offer, and that the offer was rejected.[14]

Nor is Cardiges' trial testimony undermined by his subsequent assertion that he "always felt or suspected that people above me knew of different activities that were going on." As noted above, Cardiges further explained this statement in a portion of his testimony that counsel chose not to include:

> I had nothing -- I had no proof, and that's what the FBI kept hammering, "Do you have some written proof? Do you have pictures?" Do you have this, do you have that, and I did not have any hard substantial proof.

---

[14]The defendants' contention that the dealer in question was awarded dealership after making the offer to Cardiges is not supported by the facts. See supra notes 7-8.

18

Similarly, Cardiges' acknowledgment during deposition testimony that "he had heard" of occasions on which Japanese management at American Honda received objects of value from dealers does not refute his assertions at trial that he had no "proof," or "specific" or "firsthand" knowledge, of corruption.

Because the new evidence does not demonstrate that Cardiges committed perjury at trial, and because the defendants do not assert that the government failed to disclose this evidence, the court need only consider this new evidence under the traditional Rule 33 standard. At this level of review, the defendants fail to meet their burden. First, as to defendant Billmyer, evidence concerning the BMW offer was known to him prior to trial. Second, and as noted with respect to Novelly's testimony concerning the Amemiya episode, the new evidence offered by Cardiges is largely cumulative of the testimony offered at trial by Power and Proulx. In light of the compelling evidence of the defendants' intent to defraud American Honda, the court cannot find that introduction of the evidence contained in Cardiges' deposition testimony would probably result in an acquittal on retrial. Indeed, the court is of the opinion that it is highly improbable that the introduction of this testimony would result in different verdicts.

19

E.   Combined Effect of the Undisclosed Evidence

Having found that each item of new evidence is insufficient, by itself, to warrant a new trial, the court turns to the question of whether the combined effect of the newly discovered evidence warrants a new trial.[15]

As the court's consideration of each item of newly discovered evidence indicates, the defendants had ample opportunity throughout the trial to present to the jury their assertion that American Honda condoned their activity and they litigated that issue thoroughly.  The new evidence, which for the most part duplicates the tenor of the evidence adduced at trial, does little to undermine the overwhelming evidence that the defendants formed the requisite intent to commit the crimes with which they were charged.  The court finds that there is no reasonable probability that introduction of the new evidence proffered by the defendants, when viewed as a whole, would have likely resulted in different verdicts.  Such evidence, taken

_____

[15]Although it is well settled that the standard to be applied to each item of new evidence depends on whether the evidence was withheld by the government, <u>Kyles</u>' command that the court consider the cumulative effect of newly discovered evidence, 514 U.S. at 436, raises the question of the appropriate standard to be applied where, as here, some, but not all, of the newly discovered evidence was in the government's possession at the time of trial.  In an abundance of caution, the court applies the less deferential "reasonable probability" standard to the cumulative effect of all of the new evidence.

together, is insufficient, when weighed in the context of all of the other evidence in the case, to undermine confidence in the jury's verdicts.  It is highly improbable that the introduction of the "newly discovered" evidence would result in different verdicts.

## Conclusion

The defendants' motions for a new trial (document nos. 521 & 535) are denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

July 17, 1997

cc:  David Long, Esquire
     Paul Twomey, Esquire
     U.S. Attorney
     U.S. Probation
     U.S. Marshal